## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### Baltimore Division

| | |
|---|---|
| **TRAVIS PAVLOCK** | * |
| 1720 Charles Ray Acres Drive | |
| Sykesville, Maryland 21784 | * |
| | |
| **SOPHIE HELLDORFER** | * |
| 1664 Mussula Road | |
| Towson, Maryland 21286 | * |
| | |
| And | * |
| | |
| **LINDA WHALEY-JOHNSON** | * |
| 3708 Shellbrook Court | |
| Randallstown, Maryland 21133 | * |
| | |
| *Plaintiffs,* | * |
| | |
| v. | * |
| | |
| **CHANCELLOR JAY A. PERMAN, M.D.,** | * |
| **In His Official Capacity as Chancellor** | |
| **UNIVERSITY OF MARYLAND** | * |
| 701 E. Pratt Street | |
| Baltimore, Maryland 21202 | * |
| | |
| And | * |
| | |
| **BOARD OF REGENTS** | * |
| **UNIVERSITY SYSTEM OF MARYLAND** | |
| 3300 Metzerott Road | * |
| Adelphi, Maryland 20783 | |
| | * |
| | |
| *Defendants.* | * |

**Case No.:**  1:21-cv-02376

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## COMPLAINT FOR DECLARATORY AND
## <u>INJUNCTIVE RELIEF</u>

Plaintiffs Travis Pavlock, Sophie Helldorfer, and Linda Whaley-Johnson, are students

and employees of the University System of Maryland ("USM"), by and through their attorneys,

Jennifer Bland Lester, Esq. files their Complaint for Declaratory and Injunctive Relief, against the Defendants as follows:

## Introduction

1.      This is a civil action for declaratory and injunctive relief arising under the First, Fourth, Fifth, Ninth and Fourteenth Amendments to the United States Constitution; violation of 21 U.S. Code § 360bbb-3; State and federal laws providing for informed consent; and the requirements for compulsory vaccination as formulated under *Jacobson v. Massachusetts,* 1971 U.S. 11 (1905).

2.      This action involves the constitutionality of the University System of Maryland's COVID-19 Vaccination Mandate ("USM Mandate") issued on April 23, 2021, through a press announcement by the Chancellor of USM, Chancellor Jay A. Perman, M.D.

3.      The USM Mandate violates the liberty interests protected by the First, Fourth, Fifth, Ninth and Fourteenth Amendments to the United States Constitution, which include and encompass rights of personal autonomy and bodily integrity, including the right to reject medical treatment.

4.      The USM Mandate also violates 21 U.S. Code § 360bbb-3, the federal law authorizing the issuance of Emergency Use Approval ("EUA") of the COVID-19 Vaccines, which explicitly prohibits any medical products which are approved pursuant to an EUA status from being made compulsory.

5.      The USM Mandate violates federal and State law regarding an individual's right to informed consent.

6.     Furthermore, the USM Mandate does not follow the requirements established for a State to issue compulsory vaccinations as required by the holding of *Jacobson v. Massachusetts,* 1971 U.S. 11 (1905).

7.     The application of the USM Mandate creates a new *defacto* suspect classification based on biology and establishes a system of disparate and discriminatory treatment towards individuals who are classified as "unvaccinated" in violation of the 14th Amendment.

## Venue and Jurisdiction

8.     This Court has subject matter and personal jurisdiction over the parties, Jurisdiction of this Court is invoked pursuant to Article III of the U.S. Constitution, 28 U.S.C. § 1331 and 1343, 42 U.S.C. § 1983 and 1988, 42 U.S. C. § 2000d, and common law pursuant to 28 U.S. C. § 1367(a). This Court also has jurisdiction pursuant to the Declaratory Judgment Act codified at 28 U.S.C. §§ 2201 and 2202.

9.     Venue is proper under 28 U.S.C. § 1391(b) because all of the Plaintiffs reside in the State of Maryland, the University of Maryland System's office is headquartered in Baltimore City, Maryland.

10.     Article III provides jurisdiction to this Honorable Court because the Plaintiffs allege that the Defendants have violated the Plaintiffs' constitutional rights by issuing a mandate requiring them to take a COVID-19 vaccine and such a mandate is in direct conflict with federal law, which provides that the three Emergency Use Authorized ("EUA") COVID-19 vaccines cannot be made mandatory, that the University of Maryland is discriminating against individuals based on a biological classification, and the University of Maryland's COVID-19 vaccination mandate violates the requirements of compulsory vaccines as outlined by the Supreme Court's ruling in *Jacobson v. Massachusetts,* 1971 U. S. 11 (1905).

3

11.     Additionally, this Honorable Court has jurisdiction because the Plaintiffs allege that the Defendants have violated the Plaintiffs' rights under the Bill of Rights of the United States Constitution.

12.     The Plaintiffs request that this Honorable Court decide any state law questions within the Complaint by virtue of *pendente lite* jurisdiction pursuant to 28 U.S.C. 1367(a) and common law.

**Parties**

13.     Plaintiff Travis Pavlock is a twenty-one year old resident of Carroll County, Maryland and a senior at Towson University, enrolled to start his senior year in the fall semester 2021.

14.     Plaintiff Sophie Helldorfer is a twenty year old resident of Baltimore County, Maryland and a sophomore at Towson University, enrolled to begin the fall semester 2021.

15.     Plaintiff Linda Whaley-Johnson, is a resident of Baltimore County, Maryland, has been employed at the University of Maryland School of Law since 1990.

16.     Defendant Jay A. Perman, M.D. is the Chancellor of the University System of Maryland ("USM"). As Chancellor, Dr. Perman is the Chief Executive Officer of USM and the Chief of Staff for the Board of Regents, and in this capacity is charged with all duties outlined in Md. Code, Educ. § 12-108.

17.     USM is a "body corporate and politic" and is "an instrumentality of the State" and "an independent unit of State government."  (Md. Code, Educ. § 12-102.)

18.     The University System of Maryland ("USM") is a public institution of higher education established in 1865 by the Maryland General Assembly as a state agricultural school.  USM was established on ancestral land of the Piscataway tribe, purchased from a slaveholding farmer, and opened in 1859 with 34 students. *Id.*

19.     USM consists of twelve different constituent institutions: University of Maryland, College Park; University of Maryland, University of Maryland Baltimore County; University of Maryland Center for Environmental Science, University of Maryland Global Campus; University of Maryland Eastern Shore; University of Maryland Global Campus; Bowie State University; Coppin State University; Frostburg State University; Salisbury University; Towson University; and University of Baltimore. (Md. Code, Educ. § 12-101(b)(6).)

20.     Defendant Board of Regents is responsible for the government of USM, which consists of 21 members and includes the Secretary of Agriculture; Secretary of Commerce, an appointment by the President of the Senate, appointment by the Speaker of the House, and members from the general public to include individuals with backgrounds in finance, higher education administration, diversity and workplace inclusion, as well as student members. (Md. Code, Educ. § 12-102.)

21.     Defendant Board of Regents are responsible for the management of USM and has all the powers outlined in Md. Code, Educ. § 12-104.

**Facts**

**A. University System of Maryland COVID-19 Vaccine Requirement**

22.     On April 23, 2021, through a press announcement, Defendant Chancellor Jay A. Perman, M.D. announced that USM was making the COVID-19 vaccine compulsory for the 2021-2022 school year: "I'm requiring all eligible students, faculty, and staff who will be on Maryland campuses this fall be vaccinated against COVID-19." (See attached as Exhibit A, April 23, 2021 Press Release of Chancellor Jay A. Perman, M.D.)

23.     The only information Defendant Chancellor Jay A. Perman. M.D. provided regarding how USM reached its decision to mandate a COVID-19 vaccine was that the decision was "based on the recommendation of a USM workgroup I convened this semester." (See Ex. A.)

24.     At the time of the April 23, 2021 USM Mandate announcement, the Plaintiffs were not provided with any direct information from USM regarding the application of the COVID-19 vaccine mandate.

25.      Since the April 23, 2021 announcement of the USM Mandate information concerning how the mandate would be implemented, available exemptions to the mandate, requirements for individuals receiving the exemption and consequences for not complying with the mandate has trickled out of the USM system through the ten different universities creating a confusing situation.

26.     Each of the ten universities within USM have issued their own separate requirements regarding the COVID-19 vaccine, exemptions to the vaccine, and restrictions placed upon individuals who receive an approved exemption to the COVID-19 vaccine mandate.

**B.  The COVID-19 Vaccines**

27.     Currently, there are three COVID-19 vaccines available on the market for students and employees to receive, all three vaccines are still in the midst of continuing clinical trials.

28.     These vaccines are manufactured by either Pfizer, Moderna, or Janssen Biotech, Inc., and all three received initial approval under  Emergency Use Authorization ("EUA") authorization pursuant to 21 U.S. Code § 360bbb-3.

29.     At the time of the issuance of the USM Mandate, all three of the COVID-19 vaccines had not received approval for general use by the Federal Food and Drug Administration, as all three remain in clinical trials which are scheduled to finalize as follows: Moderna COVID19 vaccine

6

clinical trials end on October 22, 2022; Pfizer COVID19 vaccine clinical trials end on May 2,

2023; and Janssen COVID19 vaccine clinical trials end on January 2, 2023. (See attached as

Exhibit B, Emergency Use Authorization (EUA) for an Unapproved Product Review

Memorandum for Moderna TX, Inc., Submission Date November 30, 2020. See attached as

Exhibit C, Emergency Use Authorization (EUA) for an Unapproved Product Review

Memorandum for Pfizer, Inc., on behalf of Pfizer and BioNTech, November 20, 2020. See

attached as Exhibit D, Emergency Use Authorization (EUA) for an Unapproved Product Review

Memorandum for Janssen, February 4, 2021.)

30.     To date, all three available COVID-19 vaccines were approved without going through the

standard testing and review process and were given a special classification provided by federal

law which allows for the production of a medical product in emergency situations, only one of

the three COVID-19 vaccines has recently received full approval, and none of the COVID-19

vaccines have completed clinical trials.

31.     While under this special classification the medical product is considered "unapproved"

and as such under the federal law which authorized the approval of the three COVID-19 vaccines

an individual cannot be required to receive the product. See 21 U.S. Code § 360bbb-3 (e)(1)(A)

of the aforementioned statute it states:

> With respect to the emergency use of an unapproved product, the Secretary, to the
> extent practicable given the applicable circumstances described in subsection (b)(1),
> shall, for a person who carries out any activity for which the authorization is issued,
> establish such conditions on an authorization under this section as the Secretary finds
> necessary or appropriate to protect the public health, including the following:
>
> (i) Appropriate conditions designed to ensure that health care professionals
>     administering the product are informed--
>     (I)  that the Secretary has authorized the emergency use of the product;

7

    (II) of the significant known and potential benefits and risks of the emergency use of the product, and of the extent to which such benefits and risks are unknown; and

    (III)     of the alternatives to the product that are available, and of their benefits and risks.

 (ii) Appropriate conditions designed to ensure that individuals to whom the product is administered

    (I)     that the Secretary has authorized the emergency use of the product;

    (II)     of the significant known and potential benefits and risks of such use, and of the extent to which such benefits and risks are unknown; and

    (III)     **of the option to accept or refuse administration of the product**, of the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks. (emphasis added)

32.     Even though the FDA granted emergency use authorizations for the Moderna, Pfizer/BioNTech and Jansen & Jansen vaccines, it is the completion of the clinical trials, and the data produced from those trials, upon which the FDA will rely to ultimately decide whether to license these vaccines for full approval. These clinical trials are still underway and are designed to last for approximately two years from the date of application to collect adequate data to establish if these vaccines are safe and effective enough for the FDA to license.

33.     The abbreviated timelines for the emergency use applications and authorizations means there is much the FDA does not know about these products including their effectiveness against infection, death, and transmission of SARS-CoV-2, the virus that is allegedly the cause of the COVID disease.

34.     Given the uncertainty about the three COVID-19 vaccines, their EUAs are explicit that each is "an investigational vaccine not licensed for any indication" and require that all "promotional material relating to the Covid-19 Vaccine clearly and conspicuously ... state that this product has not been approved or licensed by the FDA, but has been authorized for emergency use by FDA." (See Exs. B, C and D.)

35.    The FDA's website further clarifies the restrictions on EUA approved medical products are as follows: "FDA believes that the terms and conditions of an EUA issued under section 564 preempt state or local law, both legislative requirements and common-law duties, that impose different or additional requirements on the medical product for which the EUA was issued in the context of the emergency declared under section 564 … In an emergency, it is critical that the conditions that are part of the EUA or an order or waiver issued pursuant to section 564A — those that FDA has determined to be necessary or appropriate to protect the public health—be strictly followed, and that no additional conditions be imposed."

36.    On August 26, 2020 at a Centers for Disease Control and Prevention published meeting of the Advisory Committee on Immunization Practices the Committee's Executive Secretary and Chief Medical Officer of the National Center for Immunizations and Respiratory Diseases, Dr. Amanda Cohn stated (@1:14:40):

> "I just wanted to add that, just wanted to remind everybody, that under an Emergency Use Authorization, an EUA, vaccines are not allowed to be mandatory. So, early in this vaccination phase, individuals will have to be consented and they won't be able to be mandated."

### C. All three of the COVID-19 Vaccines are classified as an Investigational Medical Products under both Maryland and Federal law

37.    At the time of the issuance of the USM Mandate, all three of the COVID-19 vaccines available were classified under Maryland law as investigational medical products.

38.    Investigational medical products are defined as "a drug, biological product, or device that: (1) Has successfully completed Phase 1 of a clinical trial but has not yet been approved for general use by the United States Food and Drug Administration; and (2) remains under investigation or in a clinical trial approved by the United States Food and Drug Administration." (Md. Code, Health-Gen. § 21-2B-01 (f).)

39.     Maryland law only permits the use and administration of investigational drugs in limited situations to Maryland residents who can be classified as "eligible patients." Md. Code, Health-General § 21-2B-02 (a). An "eligible patient" is defined in Md. Code, Health-General § 21-2B-01(c) as follows:

> "Eligible Patient" means an individual who:
> (1) has a terminal illness, attested by the individual's treating physician;
> (2) has considered all other treatment options, currently approved by the United States Food and Drug Administration; and
> (3) has received a recommendation from the individual's treating physician for the use of an investigational drug, biological product, or device;
> (4) (i) Has given informed consent for the use of the investigational drug, biological product, or device; or
> (ii) If the individual is a minor or lacks the mental capacity to provide informed consent, has a parent or legal guardian who has given informed consent on the individual's behalf for the use of the investigational drug, biological product, or device;
> (5) Is ineligible for or unable to participate in a clinical trial; and
> (6) Has documentation from the individual's treating physician that the individual meets the requirements of items (1) through (5) of this subsection.

40.     Maryland law requires a very specific type of informed consent for an individual to receive an investigational medical product is specifically delineated in Maryland law and is "a written document prepared using the informed consent form developed by the Office of the Attorney General in accordance with § 21-2B-02(d)(1)."

41.     The informed consent provided to an individual under Md. Code, Health-General § 21-2B-01(d)(1) requires that Maryland's Attorney General develop a form that "complies with the requirements of § 21-2B-01(e)(3) of this subtitle."

42.     Pursuant to Md. Code, Health-General § 21-2B-01(e)(3), the Attorney General is required to develop a form for patients and doctors to sign which advises Maryland patients of their rights to "Informed consent" when receiving an investigational medical product. The law requires that the form contains the following "as a minimum" information:

(i)  Explains the currently approved products and treatments for the disease or condition from which the patient suffers; Attests to the fact that the patient concurs with the patient's treating physician in believing that all currently approved and conventionally recognized treatments are unlikely to prolong the patient's life;

(ii)  Identifies clearly the specific proposed investigational drug, biological product, or device that the patient is seeking to use; Informs the provider and eligible patient of any known or anticipated side effects, risks, or reported patient discomfort that is likely related to the treatment;

(iii)  Describes the best and worst potential outcomes of using the investigational drug, biological product, or device with a realistic description of the most likely outcome, including the possibility that new, unanticipated, different, or worse symptoms might result and that death could be hastened by the proposed treatment, based on the treating physician's knowledge of the proposed treatment in conjunction with an awareness of the patient's condition;

(iv)  Makes clear that the patient's carrier and health care provider are not obligated to pay for any care or treatments that are necessary as a result of the use of the investigational drug, biological product, or device except as required by federal or State law or contract;

(v)  Makes clear that the patient's eligibility for hospice care may be withdrawn if the patient begins curative treatment with the investigational drug, biological product, or device and that hospice care may be reinstated if this treatment ends and the patient meets hospice eligibility requirements; and

(vi)  States that the patient understands that the patient may be liable for all expenses relating to the use of the investigational drug, biological product, or device and that this liability extends to the patient's estate, but not the heirs or legatees of the patient.

### D.  Application of the USM Mandate at the Constituents Institutions

43.     Each of the twelve Constituents Institutions within USM are responsible for the administration of the USM Mandate, and each institution has established different protocol and requirements for students and employees regarding the COVID-19 vaccine.

44.     The application of the USM Mandate has created a confusing situation and establishes an unequal application of the USM Mandate, unfairly targeting individuals who exercise their liberty interest in refusing medical treatment and who seek to invoke their right to informed consent, privacy and religious freedom.

11

45.     The Plaintiffs have all received different information at different times regarding the USM Mandate, as well as differing requirements or protocols that they must follow as USM classifies these individuals as "unvaccinated."

46.     Plaintiff, Travis Pavlock has not received any of the three COVID-19 vaccines, and had not submitted, or received, an approved exemption to the COVID-19 vaccine as of August 18, 2021, and was not notified by Towson that he would be subject to." (See attached as Exhibit E, Affidavit of Travis Pavlock, pg. 2, ¶ 14.)

47.     Plaintiff Pavlock has been notified through generic mass emails from Towson University and as well as information provided on Towson University's website that he will be subject to "student conduct charges" for failing to comply with the USM Mandate, although the specifics of what the "student conduct charges" entails have not been directly provided to Plaintiff Pavlock, except a general notification that Plaintiff Pavlock could be subjected to "student conduct charges and limited access to TU buildings, recreational spaces and will face cancellation of their fall or spring course registration." (See Ex. E, pg. 2, ¶ 14.)

48.     On August 23, 2021, Plaintiff Pavlock was placed on "university probation" until he submitted and was approved for an exemption or submitted proof of receipt of the COVID19 vaccine. (See Ex. E, pg. 3, ¶ 17.)

49.     In order to maintain his enrollment with Towson University Plaintiff Pavlock submitted a religious exemption to the COVID19 for which he was approved, Plaintiff Pavlock felt coerced into submitting this exemption. (See Ex. E, pg. 3, ¶ 19.)

50.     Plaintiff Sophie Helldorfer has received an approved religious exemption to the USM Mandate. (See attached as Exhibit F, Affidavit of Sophie Helldorfer, pg. 2, ¶ 12.)

51.     While Plaintiff Helldorfer does have sincerely held religious beliefs which advise her not to receive the COVID-19 vaccine, she did not want to file for a religious exemption, but felt coerced into doing so in order to avoid the COVID-19 vaccine mandate imposed upon her by Towson University. (See Ex. F, pg. 2, ¶ 13.)

52.     Plaintiff Helldorfer has been notified by Towson University that she will be subjected to masking, twice weekly COVID-19 testing, additional random COVID-19 testing, and masking, as well as other requirements which are unknown to Plaintiff Helldorfer at this time but may become a requirement in the future, and may prevent Plaintiff Helldorfer from attending classes and meeting the academic requirements for her semester. (See Ex. F, pgs. 2-3, ¶ ¶ 15, 17. See also attached as Exhibit G, Towson University Temporary COVID-19 Code of Student Conduct Addendum.)

53.     Plaintiff Linda Whaley-Johnson received a religious exemption to the USM Mandate. (See attached as Exhibit H, Affidavit of Linda Whaley-Johnson, pg. 2, ¶ 7.)

54.     Plaintiff Whaley-Johnson has been notified that she will have to follow "safety measures" which are different from those employees who are vaccinated, to include daily symptom checker for the days that she is on campus and compulsory masking over and beyond that required of vaccinated individuals. (See Ex. H, pg. 2, ¶ ¶ 7-9.)

55.     Plaintiff Whaley-Johnson is unable to wear a face mask for any length of time due to medical reasons because wearing a mask results in Plaintiff Whaley-Johnson feeling dizzy, having difficulty breathing, and feeling as if she is going to pass out. (See Ex. H, pg. 2, ¶ ¶ 10-14.)

56.     Plaintiff Whaley-Johnson has requested a reasonable accommodation be provided by her employer to allow her to work without a face mask, this request is still being considered, until

13

the accommodation is approved, Plaintiff Whaley-Johnson is required to utilize paid leave time and not permitted to work remotely or be present on the campus. (See Ex. H, pg. 2-3, ¶ ¶ 15-16.)

### E.  The COVID-19 Vaccines Do Not Stop the Spread of COVID-19

57.     Data provided by the State and federal government indicate that the safety and efficacy of the three COVID-19 vaccines is questionable, in fact the three COVID-19 vaccines do not prevent COVID-19 or the transmission of COVID-19.

58.     On August 17, 2021, Secretary of the Maryland Department of Health Schrader stated at the Maryland Senate Vaccine Oversight Committee meeting that the three COVID-19 vaccines do not prevent the spread of COVID-19: "This is a little known fact I think. I think when the vaccine was developed the thought was this was going to prevent COVID from infecting people. What, the design of the vaccine is really done, it's designed to prevent hospitalizations and deaths. So it has a different level. It doesn't mean that people won't get infected. That's where the challenge is." (See Senate Vaccine Oversight Workgroup (8/18/21) at:

https://mgaleg.maryland.gov/mgawebsite/Committees/Media/false?cmte=vow&clip=VOW_8_1 7_2021_meeting_1&ys=2021rs time stamp: 30:05 to 30:30.)

59.     Secretary Schrader's statement to the Senate Vaccine Oversight Workgroup on August 17, 2021, directly contradicts the stated interest of USM in requiring the COVID-19 vaccine as the "mandating a COVID vaccine is a reasonable and necessary means of preventing the spread of the disease." (Ex. A.)

### F.  The Safety of the COVID-19 Vaccines is Questionable

60.     The United States Centers for Disease Control maintains a database of injuries and adverse events associated with the administration of all vaccines, including the three COVID-19 vaccines, this information is compiled into the Vaccine Adverse Event Reporting System

(VAERS) database and available for the public to review. (See attached as Exhibit I, VAERS database of COVID-19 vaccine adverse events. Data provided as of September 5, 2021, there were 2,203,601 adverse events reported to VAERS. United States Department of Health and Human Services (DHHS), Public Health Service (PHS), Centers for Disease Control (CDC) /Food and Drug Administration (FDA), Vaccine Adverse Event Reporting System (VAERS) 1990 - 08/27/2021, CDC WONDER On-line Database. Accessed at http://wonder.cdc.gov/vaers.html on Sep 5, 2021 12:16:01 PM.)

61.     On April 13, 2021, the CDC and FDA issued a joint statement on the Janssen COVID-19 Vaccine due to a prevalence of blood clot issues in women aged 18 through 48. (See attached as Exhibit J, April 13, 2021 Joint CDC and FDA Statement on Janssen COVID-19 Vaccine.)

62.     Each vaccine insert contains a list of known side effects and warns of possible unknown side effects.

63.     The Moderna COVID-19 Vaccine insert states that the vaccine should not be administered to "individuals with a known history of a severe allergic reaction to any component of the Moderna COVID-19 Vaccine." In addition, the Moderna fact sheet identifies the following possible adverse reactions: myocarditis and pericarditis among males between the ages of 18 and 24, and fainting, among other adverse reactions. (See attached as Exhibit K, Moderna COVID-19 Fact Sheet for Healthcare Providers Administering Vaccine (Vaccination Providers) Emergency Use Authorization (EUA) of the Moderna COVID-19 Vaccine to Prevent Coronavirus Disease 2019 (COVID-19). Pg. 4.)

64.     The Pfizer-BioNTech COVID-19 Vaccine insert states that the vaccine should not be administered to "individuals with a known history of a severe allergic reaction to any component of the Pfizer-BioNTech COVID-19 Vaccine." In addition, the Pfizer-BioNTech COVID-19 fact

sheet identifies the following possible adverse reactions: myocarditis and pericarditis among males between the ages of 18 and 24, and fainting, among other adverse reactions. (See attached as Exhibit L, Pfizer-BioNTech COVID-19 Fact Sheet for Healthcare Providers Administering Vaccine (Vaccination Providers) Emergency Use Authorization (EUA) of the Pfizer-BioNTech COVID-19 Vaccine to Prevent Coronavirus Disease 2019 (COVID-19). Pg. 8.)

65.     The Janssen COVID-19 Vaccine insert states that the vaccine should not be administered to individuals with "a known history of severe allergic reaction to any component of the Janssen COVID-19 Vaccine." In addition, the Janssen COVID-19 fact sheet identifies the following possible adverse reactions: thrombosis with thrombocytopenia, with highest rates of reporting in females between the ages of 18 to 49 years, and in some cases fatal; Guillain-Barre Syndrome; Altered Immuncompetence; fainting; as well as a list of other adverse reactions seen in clinical trials and identified post use authorization. (See attached as Exhibit M, Fact Sheet for Health Care Providers Administering Vaccine (Vaccination Providers) Emergency Use Authorization (EUA) of the Janssen COVID-19 Vaccine to Prevent Coronavirus Disease 2019 (COVID-19). Pgs. 3-4.)

### G.  USM Students and Employees have limited rights to pursue compensation for injuries sustained from the COVID-19 Vaccines

66.     USM students and employees are extremely limited in their ability to pursue financial relief for injuries sustained from receipt of the COVID-19 vaccines.

67.     Passed in October 1996, the National Childhood Vaccine Injury Act of 1986, codified at 42 U.S.C.  300aaa-10 *et. seq.* eliminates liability for pharmaceutical companies for injuries sustained by individuals as result of vaccinations and requires individuals to make claims for compensation due to injuries to the National Vaccine Injury Compensation Program (VICP).

68.    The VICP does not cover any injuries related to the COVID-19 vaccines, instead individuals who are injured from COVID-19 vaccines are limited to pursuing claims through the Countermeasures Injury Compensation Program (CICP) which was established in 2005 through the passing of the Public Readiness and Emergency Preparedness Act (PREP Act) codified at 42 U.S.C. 247d-6d and 42 U.S. C. 247d-6e.

69.    The PREP Act limits liability for injuries sustained by an individual further and does not allow students or employees to sue USM for injuries sustained from compulsory COVID-19 vaccines.

70.    Because the COVID-19 vaccines are only approved pursuant to an EUA authorization claims for injuries must be made according to the requirements of the PREP Act through the CICP.

71.    There are differences between VICP and CICP in compensation available to vaccine injured individuals, and students and employees making claims for injuries sustained from the COVID-19 vaccine cannot receive compensation for attorney or expert witness costs, nor does it awards for suffering and damages, these types of relief are available for individuals who make claims through VICP.

72.    The USM Mandate requires that students and employees assume a great deal of financial and personal liability without any compensation for the requirement that they inject an investigational medical product into their bodies.


### REQUEST FOR DECALATORY JUDGMENT

**Grounds for Relief I: The USM COVID-19 vaccine mandate violates the Plaintiffs' substantive due process rights protected by the 14th Amendment of the United States Constitution.**

17

73.     The Plaintiffs hereby incorporates paragraphs one through seventy-three as if fully asserted herein.

74.     To prevail in a due process claim Plaintiffs must prevail in a multi-prong test. First the Plaintiffs must demonstrate that they have a protected liberty interest, then the Plaintiffs have to show how that interest has been limited or deprived by state action, and finally demonstrate how the procedures employed by the state in the deprivation of their liberty interest was unconstitutional. *Shirvinski v. U.S. Coast Guard*, 673 F.3d 308, 314 (4th Cir. 2012).

75.     Once it is determined that a liberty interest exists, the court then analyzes whether an individual's constitutional rights have been violated by "balancing his liberty interests against the relevant state interests." *Cruzan ex. rel. Cruzan v. Director, Missouri Department of Health*, 479 U.S. 261 quoting *Youngberg v. Romeo,* 457 U.S. 307, 321 (1982).

76.     Here, the Plaintiffs have a long recognized liberty interest in their right as competent individuals to make their own medical decisions and this liberty interest is well established legal precedent as protected by the 14th Amendment and rooted in common law.

77.     Included with the right of an individual to make their own medical decisions is an individual's right to refuse unwanted medical treatment, this right has to be particularly protected when an individual is required to assume most of the financial and personal liability with the medical decision.

78.     The students and employees of USM have been deprived of their constitutionally protected right to make their own medical decisions by USM's action in mandating the COVID-19 vaccine for employment or enrollment in the University of Maryland.

79.     When the State denies liberty interests, the Court is required to balance the state's interests against the individual individual's liberty interest, as well as to examine the procedures utilized in curtailing the liberty interests.

80.     The State's interest must be "narrowly tailored to serve a compelling government interest." See *San Antonio School District v. Rodriguez*, 411 U.S. 1, 16 (1973).

81.     Here, the compelling interest of the State is to "prevent the spread of COVID19" as stated by Chancellor Perman on April 23, 2021, however, Secretary Schrader admitted in testimony before the Maryland Senate Vaccine Oversight Committee on August 17, 2021 that none of the three COVID19 vaccines stop the spread of COVID19. (See Senate Vaccine Oversight Workgroup (8/18/21) at: https://mgaleg.maryland.gov/mgawebsite/Committees/Media/false?cmte=vow&clip=VOW_8_1 7_2021_meeting_1&ys=2021rs time stamp: 30:05 to 30:30.)

82.     For the government to prevail on a constitutional challenge to denial of a liberty interest, the compelling government interest articulated by the State as the basis for denial of the liberty interest must be "grounded on more than mere speculation, exaggerated fears, or post-hoc rationalizations." *West v. Grams,* 607 F. App'x. 561, 567 (7th Cir. 2015).

83.     In the case before this Honorable Court, the Secretary of the Maryland Department of Health admits that the three COVID19 vaccines do not accomplish the goal of stopping the spread of COVID19, which is the stated objective of the USM Mandate.

84.     Employing the accepted compelling government interest test in this case results in the USM Mandate being found to be an unconstitutional infringement upon the Plaintiffs' substantive due process rights.

**Grounds for Relief II: The USM COVID-19 vaccine mandate violates the Plaintiffs'**
**procedural due process rights protected by the 14th Amendment of the United States**
**Constitution.**

85.     The Plaintiffs hereby incorporate paragraphs one through eighty-five as if fully asserted

herein.

86.     The imposition of a COVID-19 vaccine mandate is an exercise of the police power by

USM.

87.     The 10th Amendment to the Constitution gives states the rights and powers that are not

delegated to the United States. In determining whether there is a valid exercise of the police

power a two-pronged analysis is applied: (1) whether the object of the regulation is one in which

the police power may be properly invoked and (2) whether there is a reasonable and substantial

relationship between the police power invoked and the objective obtained.

88.     In 1905, the Supreme Court outlined the requirements for States to employ when issuing

vaccine mandates in the case of *Jacobson v. Massachusetts,* 197 U.S. 11, (1905).

89.     *Jacobson* held that a State may "invest local bodies called into existence for the purpose

of local administration with authority in some way to safeguard the public health and safety." *Id.,*

at 28.

90.     In applying the first prong, whether USM may properly invoke the police power in

issuing the COVID-19 vaccine mandate, it is clear that USM Mandate fails as USM does not

have the proper authority to issue the COVID-19 Mandate.

91.     Compulsory vaccination for the University System of Maryland are implemented by the

Maryland Higher Education Commission pursuant to Md. Code, Educ. § 11-105(t) which

provides that the Maryland Higher Education Commission "shall assist the Maryland

Department of Health in implementing the vaccination requirements adopted under § 18-102(c) of the Health-General Article.

92.     Maryland law requires that mandatory vaccines for higher education be adopted and approved through the Maryland Department of Health, and as such, mandated vaccines are subject to the rules and requirements of the Maryland Administrative Procedure Act found at Md. Code, State Govt., Title 10.

93.     Both the Maryland Higher Education Commission and the Maryland Department of Health are subject to the requirements of Maryland's Administrative Procedure Act, which allow for public hearings and the opportunity for citizens to submit comments and questions, and to be involved in the process regarding regulations implemented.

94.     Absent any enabling statute or rule, USM is not authorized to issue vaccine mandates or requirements, particularly vaccines which are classified as investigational medical products as a mandate for school enrollment or employment.

95.     USM failed to follow the Maryland law in implementing its COVID-19 vaccination policy as the COVID-19 vaccination requirement was not issued by the Maryland Commission on Higher Education and was not an adopted requirement of the Maryland Department of Health.

96.     Without State enabling statute or rule, the USM COVID-19 Vaccine mandate violates the requirements set forth in *Jacobson v. Massachusetts* for compulsory immunization and violates the procedural due process requirements of the 14th Amendment.

**Grounds for Relief III: The USM COVID-19 vaccine mandate violates the Plaintiffs' procedural due process rights protected by the 14th Amendment of the United States Constitution as the USM Mandate is coercive.**

97.     The Plaintiffs hereby incorporate paragraphs one through ninety-seven as if fully asserted herein.

98.     "Coercion, whether physical or mental, is forbidden and violates the Due Process Clause of the Fourteenth Amendment." *Payne v. State of Arkansas,* 356 U.S. 560 (1958).

99.     The Due Process Clause prohibits Defendants from coercing any individual to accept an experimental medical product.

100.    The USM Mandate coerces students to accept experimental vaccines, vaccines which have been determined not to prevent the spread of COVID-19, vaccines that are still under investigation, and vaccines for which there is insufficient data to make an informed choice.

101.    The Plaintiffs to this case are faced with the illusion of a choice, either they receive an injection of an experimental medical product to maintain their school enrollment or employment, or they lose their job and are unable to continue their education at USM.

102.    While students and employees may apply for a religious or medical exemption to the COVID19 vaccine requirement, there is no guarantee that the exemption requests will be accepted, and even if the exemption request is accepted, the students and employees who have received the exemption are subject to discriminatory treatment based on their biological status of being unvaccinated.

103.    The coercion of the students and employees contained with the USM Mandate violates the Plaintiff's due process rights guaranteed by the 14th Amendment.

   **Grounds for Relief IV: USM's adoption of the covid-19 vaccine mandate violates federal and Maryland law regarding informed consent.**

104.    The Plaintiffs hereby incorporate paragraphs one through one hundred four as if fully asserted herein.

105.    "Informed Consent" is a legal doctrine rooted in privacy rights protected by the due process clauses of the 5th and 14th Amendments. Due Process liberties extend to certain

22

personal choices central to individual dignity and autonomy, including intimate choices that define personal identity and beliefs. (*Eisenstadt v. Baird*, 405 U.S. 438, 453, 92 S. Ct. 1029 (1972).)

106.    It is well established Maryland law that an individual has a right to informed consent: "The fountainhead of the doctrine of informed consent is the patient's right to exercise control over his own body." *Sard v. Hardy*¸281 Md. 432, 439, 379 A.2d 1014 (Md. 1977).

107.    Maryland's basis for informed consent is rooted in the constitution "[a]s Judge Cardozo said for the New York Court of Appeals in *Schloendorff v. Society of NY Hospital*, 211 N.Y. 12, 105 N.E. 92, 93 (1914), '[e]very human being of adult years and sound mind has a right to determine what shall be done with his own body.'" *Sard v. Hardy*, 281 Md. 432, 439, 379 A.2d 1014 (Md. 1977).

108.    There is absolutely no information or data concerning the long-term safety or long-term efficacy of COVID-19 vaccines because they have been tested on humans for such a short time period and it is simply not possible to know with any reasonable degree of medical certainty whether the risks from COVID-19 vaccines outweigh their purported benefits.

109.    As a matter of law, any drug, device, or biologic, such as vaccines, approved for use under emergency-use authorization that is still under investigation cannot meet the requirements of the Due Process Clause and *Jacobson* for mandatory administration.

110.    USM's COVID-19 vaccine mandate is a violation of the Plaintiffs' constitutional rights to informed consent as well as a violation of federal and Maryland law.

111.    Additionally, any requirement to administer an investigational drug to the Plaintiffs is void as to Maryland law as none of the Plaintiffs meet the requirements of an individual qualified

to receive an investigational medical product, nor were any of the procedures followed which are required to classify an individual as an eligible patient for an investigational drug.

112.    Furthermore, if the Plaintiffs qualified as eligible patients, or through another avenue were required to receive an investigational drug, Maryland law requires that the Plaintiffs be given informed consent prior to receiving any investigational medical product.

113.    The requirement by USM for students and employees to receive the COVID-19 vaccine, or an approved exemption to the requirement, is a violation of Maryland law governing administration of investigational drugs, biological products, or devices, as well as Maryland State law governing an individual's right to informed consent.

114.    The Maryland Office of the Attorney General did not comply with the requirements of Md. Code, Health-General § 21-2B-01(e)(3) in providing an informed consent form in violation of Maryland law.

115.    Despite being required to receive by a Maryland government entity an investigational drug, Plaintiffs were never provided with any informed consent form which meets the requirements of Md. Code, Health-General § 21-2B-01(e)(3), or any informed consent form at all from USM or the Plaintiffs' respective Universities within the USM system regarding the three available COVID-19 vaccines.

116.    The failure to provide an informed consent form as outlined by Md. Code, Health-General § 21-2B-01(e)(3) is a violation of the law and of the Plaintiffs' rights to informed consent.

117.    Furthermore, as none of the Plaintiffs qualify under Maryland law to receive an investigational drug it follows that USM, and any and all other private entities, employers or government agencies, cannot require, or mandate, the receipt of any of three COVID-19 vaccines

24

which are all currently in investigational status and will remain so until at least December 2022 and April 2023.

**Grounds for Relief V: The USM COVID-19 vaccine mandate violates federal law.**

118.    The Plaintiffs incorporate paragraphs one through one hundred eighteen as if fully asserted herein.

119.    The USM COVID-19 vaccine mandate violates federal law, specifically, 21 U.S. Code § 360bbb-3, Section (e)(1)(A), which does not permit the Defendants to coerce students and employees into accepting an EUA vaccine on penalty of termination and other sanctions.

120.    The Supremacy Clause establishes that federal law "shall be the supreme Law of the Land…any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." (U.S. Const., Art. VI, cl. 2.)

121.    Where state and federal law directly conflict, state law must give way; state law is naturally preempted to the extent of any conflict with a federal statute.

122.    The doctrine of federal preemption invalidates and voids the Defendant's "Mandatory COVID-19 Vaccination."

123.    Congress enacted, and from time to time has amended, the Food, Drug and Cosmetic Act, in part, to occupy the field concerning the approval, licensure, and administration of vaccines, especially vaccines authorized for emergency-use.

124.    Pursuant to federal law, only the Secretary of Health and Human Services is authorized to introduce into interstate commerce, during a declaration of emergency, a biological product, which includes vaccines, intended for use in an actual or potential emergency under the specific requirements set forth in 21U.S.C. §360bbb-3.

125.     Only the Secretary is authorized by federal law to establish the conditions and requirements for the administration of emergency-use authorized biologics.

126.     21 U.S.C. § 360bbb-3 sets forth the "required conditions" for unapproved vaccines that are authorized for emergency use. These "required conditions" apply to "a person who carries out any activity for which the authorization is issued," including Defendants.

127.     As a condition of emergency-use authorization, the Secretary is required to establish "appropriate conditions designed to ensure that individuals to whom the product is administered are informed" of, inter alia, "the option to accept or refuse administration of the product, of the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks." 21 U.S.C. § 360bbb-3.

128.     The Secretary has established such appropriate conditions concerning the currently available COVID-19 vaccines, consistent with federal law, by not mandating COVID-19 vaccines and requiring the use of EUA Fact Sheets that must be given to caregivers and recipients of COVID-19 vaccines, informing them of their right to accept or refuse administration of the vaccine.

129.     Moreover, federal law specifically deprives the Secretary of the power to mandate emergency-use authorized treatments, devices, or biologics of any kind, including vaccines, since the law specifically requires the Secretary to establish conditions to ensure that individuals to whom the product is administered are informed of the option to accept or refuse vaccination. 21 U.S.C. § 360bbb-3.

130.     Congress passed the Food, Drug and Cosmetic Act generally, and § 360bbb-3 in particular, to occupy the field of emergency-use authorized vaccine approval and vaccine administration procedures, to set forth all required conditions for such use, and to preempt the

States from approving vaccines affecting interstate commerce for emergency use on their own, and from deviating or contradicting its regulations and guidance concerning vaccines.

131.    Additionally, preemption is implied where there is actual conflict between federal and state law concerning vaccines.

132.    The USM COVID-19 Vaccine mandate conflicts with or fails to comply with the appropriate conditions established by the Secretary and the FDA for the administration of COVID-19 emergency-use authorized vaccines.

133.    The USM Mandate does not give students "the option to accept or refuse administration" of COVID-19 vaccines without subjecting them to sanctions, such as possibly expulsion or firing from employment, frequent COVID-19 testing, more restrictive masking requirements, and possible quarantine restrictions which could result in a student's inability to complete coursework or the requirement that an employee will have to utilize paid leave.

134.    As a result, the USM Mandate punishes students for exercising their right under 21 U.S.C. § 360bbb-3.

135.    USM is not authorized to alter, amend, deviate or conflict with any of the conditions established by the Secretary for the use and administration of emergency-use authorized biologics. The USM Mandate conflicts with the Secretary's orders and directives for the use and administration of emergency-use authorized biologics by coercing its students to waive their constitutional rights to informed consent, to refuse medical treatment and to subject themselves to immunization with a vaccine that is still under investigation and otherwise experimental in order to continue to attend USM.

136.    The USM Mandate is void as against public policy and therefore is an unenforceable,

along with all of the requirements and restrictions imposed upon those individuals who have not

received the COVID-19 vaccine flowing from the USM COVID-19 vaccine mandate.

**Grounds for Relief VI: Restrictions imposed by USM upon students and employees who have not received the COVID-19 vaccine is a violation of the equal protection doctrine of the 14th Amendment.**

137.    The Plaintiffs hereby incorporate paragraphs one through one hundred thirty-seven as if

fully asserted herein.

138.    The Fourteenth Amendment to the United States Constitution states that no State shall

deprive any person within its jurisdiction the equal protection of the laws.

139.    The Supreme Court has held that the 14th Amendment prohibits the use of biological

markers as a basis for classification of individuals limiting fundamental rights.

140.    Strict scrutiny review is implicated when a classification is made "on suspect grounds

such as race, ancestry, alienage, or categorizations impinging upon fundamental rights."

*Kahawaiolaa v. Norton*, 386 F.3d 1271, 1277 (9th Cir. 2004).

141.    Under a strict scrutiny analysis a government regulation must be "narrowly tailored to

serve a compelling state interest." *Hoffman v. United States*, 767 F.2d 1431, 1435 (9th Cir. 1985).

142.    The USM Mandate is not narrowly tailored, it is in fact, overly broad as it requires every

individual who attends a USM institution as a student, or who is employed, to receive one of the

three COVID-19 vaccines.

143.    Those who do not receive the COVID-19 vaccine, or who are approved for an exemption,

are subject to disparate and discriminatory treatment by USM to include loss of employment,

loss of enrollment in school, being forced to undergo COVID-19 testing multiple times per week,

more stringent masking requirements, long quarantine periods without the guarantee of the right

28

to make up school work, and the forced use of paid leave time when the leave time would otherwise be compensated by USM. (See Exs. E - G.)

144.    These policies which treat those individuals considered vaccinated differently from those individuals considered unvaccinated are unconstitutional under a strict scrutiny standard of review, particularly in light of the fact of the State's admission that the COVID-19 vaccines do not stop the spread of COVID-19.

145.    Further, the government is required to "acknowledge and give some consideration to less restrictive alternatives in order to show that the challenged policy is the least restrictive means to achieve a compelling interest." *Couch v. Jabe*, 679 F.3d 197, 203 (4th Cir. 2012).

146.    Here, USM did not provide any consideration of any alternatives other than the most extreme, broad sweeping action to require everyone to receive an investigational medical production, the COVID-19 vaccine.

147.    The USM Mandate, and the discrimination against individuals who are not vaccinated, violates the equal protection rights guaranteed under the 14th Amendment.

WHEREFORE, the Plaintiffs respectfully request this Honorable Court:

A. Enter declaratory relief as requested finding that the USM Mandate is void as a violation of federal law pursuant to the requirements of 21 U.S. Code § 360bbb-3 and federal preemption;

B. Enter declaratory relief as requested finding that the USM Mandate is void as it violates substantive and procedural due process rights guaranteed by the 14th Amendment;

C. Enter an immediate TRO and a preliminary injunction enjoining the Defendants from taking any negative action, or disparate treatment against the Plaintiffs as individuals who are considered "unvaccinated" by USM; and

D. For such other and legal and equitable relief as the Court may deem Plaintiffs are entitled to receive.

Respectfully Submitted,

Jennifer Bland Lester
17 W. Jefferson Street, Suite 100
Rockville, Maryland 20850
410-433-3972
443-408-1037 (facsimile)
jelester@earthlink.net
Fed Bar No.: 27711

*Attorney for* Plaintiffs

### DECLARATION UNDER PENALTY OF PERJURY

The undersigned declares under penalty of perjury that he is a Plaintiff in the above action, that he has read the Complaint and that the information contained therein is true and correct to the best of his knowledge, information and belief. 28 U.S.C. § 1746 and 18 U.S.C. § 1621.

Sep 15, 2021
Date

*Travis Pavlock*
Travis Pavlock (Sep 15, 2021 18:54 EDT)
Travis Pavlock, Plaintiff

### DECLARATION UNDER PENALTY OF PERJURY

The undersigned declares under penalty of perjury that she is a Plaintiff in the above action, that he has read the Complaint and that the information contained therein is true and correct to the best of his knowledge, information and belief. 28 U.S.C. § 1746 and 18 U.S.C. § 1621.

Date

see attached
Sophie Helldorfer, Plaintiff

30

D. For such other and legal and equitable relief as the Court may deem Plaintiffs are entitled to receive.

Respectfully Submitted,

_____

Jennifer Bland Lester
17 W. Jefferson Street, Suite 100
Rockville, Maryland 20850
410-433-3972
443-408-1037 (facsimile)
jelester@earthlink.net
Fed Bar No.: 27711

*Attorney for* Plaintiffs

## DECLARATION UNDER PENALTY OF PERJURY

The undersigned declares under penalty of perjury that he is a Plaintiff in the above action, that he has read the Complaint and that the information contained therein is true and correct to the best of his knowledge, information and belief. 28 U.S.C. § 1746 and 18 U.S.C. § 1621.

_____        _____
Date                            Travis Pavlock, Plaintiff

## DECLARATION UNDER PENALTY OF PERJURY

The undersigned declares under penalty of perjury that she is a Plaintiff in the above action, that he has read the Complaint and that the information contained therein is true and correct to the best of his knowledge, information and belief. 28 U.S.C. § 1746 and 18 U.S.C. § 1621.

Sep 15, 2021                       Sophie Helldorfer
_____        _____
Date                            Sophie Helldorfer, Plaintiff

30

## DECLARATION UNDER PENALTY OF PERJURY

The undersigned declares under penalty of perjury that she is a Plaintiff in the above

action, that he has read the Complaint and that the information contained therein is true and

correct to the best of his knowledge, information and belief. 28 U.S.C. § 1746 and 18 U.S.C.

§ 1621.

Sep 15, 2021                                     Linda Whaley Johnson

_____                   _____
Date                                                    Linda Whaley-Johnson, Plaintiff

**Signature:** *Linda Whaley Johnson*
Linda Whaley Johnson (Sep 15, 2021 23:58 EDT)

**Email:** lwjohnson73@gmail.com

31